**UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

No. 95-11217

JOY MAXENE MAZUREK,

Plaintiff-Appellee,

versus

AMWEST SAVINGS ASSOCIATION, ET AL.,

Defendants,

AMWEST SAVINGS ASSOCIATION,

Defendant-Appellant.

Appeal from the United States District Court
for the Northern District of Texas

(4:95-CV-23-A)

September 3, 1996

Before KING, SMITH, and WIENER, Circuit Judges.

PER CURIAM[*]:

This is an appeal of sanctions imposed by the district court on Defendant-Appellant First American Bank, successor to AmWest Savings Association. The district court assessed a monetary

[*]Pursuant to Local Rule 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in Local Rule 47.5.4.

sanction of $2,000 against First American after concluding that First American had failed to comply with the court's order to have present for settlement discussion a representative who had "unlimited settlement authority." As we conclude that the district court did not abuse its discretion in imposing the sanction, we affirm.

## I.   FACTUAL BACKGROUND

### A.   THE MARCH 2 SETTLEMENT CONFERENCE

In the underlying litigation, the district court ordered the parties to meet to discuss settlement. The parties were ordered to have present a representative with "unlimited settlement authority." On the morning of March 2, 1995, the date set for the settlement conference, the court required the parties to announce in open court that they had a representative present with the required authority. The court asked First American's representative, its Senior Vice President of Human Resources (the Vice President), who was unsworn and seated near the rear of the courtroom, neither on the witness stand nor at counsel table, whether he had any limit on his authority to reach a settlement. The Vice President responded that he had a limit of $2,000. The court then stated that First American was in "direct violation" of its order and called a recess "until [First American] can get someone here . . . who has unlimited settlement authority."

After the recess, the Vice President was sworn in and testified under oath that he had misunderstood the court's

2

question.  He explained that during a meeting held several weeks before the settlement conference (the pre-conference meeting) First American's President (the President) had in fact given him unlimited settlement authority, but had valued the underlying suit at only $2,000:

THE COURT:          What did [the President] tell you?

VICE PRESIDENT:     Well, when we met, when we realized this conference was coming up, of course I had to go before him and explain that I had to have unlimited settlement authority as the direction was, and that was agreed upon at that time.

THE COURT:          That the authority would be for $2,000?

VICE PRESIDENT:     No, sir.  It was unlimited, and we had discussed the merits of the case.  And I misunderstood you this morning, and I apologize for that.

THE COURT:          You said he's the one that gave you the $2,000 authority.  How did you define it at $2,000?

VICE PRESIDENT:     It was not a $2,000 authority.  What we had done is discussed the merits of this settlement hearing, and then in our mind we had determined that it would be worth approximately $2,000.  But there was no limit.

* * * *

THE COURT:          What if you had gotten here this morning and had been persuaded from what you heard that the plaintiff in this case would likely get a large judgment against your company and that a settlement of $20,000 would appear to be appropriate, what would you have been able to do under those circumstances?

VICE PRESIDENT:     If I can paraphrase what [the President] told me is whatever the settlement that I

3

determined was appropriate, I better just have some good reason for that settlement.

THE COURT: Would you have to call him under those circumstances?

VICE PRESIDENT: No, sir.

B. SUBSEQUENT HEARINGS

1. *The Testimony of the President*

After the Vice President's testimony, the district court decided to hold an additional hearing the following week. At that hearing, the President took the stand and testified that he had first heard of the underlying lawsuit on March 2, the day of the settlement conference. He stated that the Vice President had called him at around noon on that day to request that the President "specifically grant him unlimited authority to settle this matter."

After the President stepped down, the district judge permitted him to re-take the stand and allowed counsel for the defendants to question the President. On direct examination, the President testified that he had been mistaken in his recollection that he had first heard about the suit on March 2, and that he had in fact held a pre-conference meeting with the Vice President several weeks before the settlement conference. The President explained that during the March 2 settlement conference, the Vice President had merely telephoned the President "to confirm the authority that he had to settle this matter."

The district judge later questioned the President more

4

thoroughly:

THE COURT: [W]hen you went back into the audience a minute ago and before you came back to the stand, you and [the Vice President] were having a conversation. Did [he] remind you of the earlier meeting?

PRESIDENT: Yes, he did.

THE COURT: When you testified on the stand earlier, you didn't recall any such meeting, did you?

PRESIDENT: I did not recall it. That is correct, sir.

Later, the President also stated that he had first heard of the $2,000 figure during his phone conversation with the Vice President on the day of the settlement conference. This testimony conflicts with the Vice President's earlier assertion that he and the President had discussed the $2,000 valuation of the settlement during their pre-conference meeting.

2. *The Conclusions of the District Court*

After the President stepped down for the second time, the district court announced that both the President and the Vice President had committed perjury:

So what we're going to do now, while I think about where we go from here, I think perjury has been committed, and that's a very serious matter. That's a criminal matter. And I believe it has been committed in this case. I think it has been committed twice.

The attorney representing First American then stated that he would like to present further testimony to establish that the Vice President and the President had not committed perjury, but instead had either misunderstood the court's questions or simply forgotten

5

relevant information.  In response, the court indicated that from that point forward, it would presume any testimony presented by First American to be without credibility:

> The unfortunate thing about this case is that I am to the point now that no matter who you put on I would have some question as to whether they would tell the truth.  I'm not saying that I have resolved that you can't put somebody on that I wouldn't accept telling the truth, but you know lawyers can conduct themselves directly and through their clients in such a way that it's difficult, then, to accept what they have to say as being credible.

The court also reiterated its conclusion that both the Vice President and the President had committed perjury.  Before any additional witnesses testified, the court stated, "And then, of course, we have the problem of [the Vice President] getting on the witness stand and claiming something that I don't believe is true. That's perjury, and it's a very serious matter."  The court commented as well, "I have a tentative conclusion that this morning I heard perjured testimony from [the President], because I very distinctly heard what he said the first time and then heard exactly the opposite after he went back and visited with [the Vice President]."

3.   *Further Evidence from First American*

After the court announced those tentative conclusions, First American continued to present evidence corroborating the testimony of the President and the Vice President.  At proceedings conducted prior to the time that the district court issued its sanctions order, and again at a hearing held after that order, in conjunction

6

with First American's motion for reconsideration, First American called numerous witnesses and offered several documents into evidence confirming the testimony of the President and the Vice President.

Specifically, during those hearings, two witnesses——First American's Vice President and Senior Legal Counsel (the Senior Legal Counsel), as well as one of First American's Human Resources Insurance Assistants (the Insurance Assistant)——testified that they were present at the pre-conference meeting between the President and the Vice President, and that at that meeting the President gave the Vice President full settlement authority for the March 2 settlement conference.

One of the attorneys representing both First American and the Adam Corporation——First American's parent company and a co-defendant in the underlying case——also testified.  He stated that prior to the March 2 settlement conference, the Vice President had indicated that he had unlimited settlement authority as required by the court's order.  Moreover, two executives from the Adam Corporation confirmed that they had granted the Vice President full settlement authority on the corporation's behalf, in compliance with the court's order, before the March 2 settlement conference.

Finally, the Vice President again took the stand to explain his conduct on March 2:

THE COURT:          What prompted you to call [the President]?
VICE PRESIDENT:     Well, I realized that apparently I

had misunderstood your question. . . . I went to the phone to call [the President] to reconfirm that I did have that settlement authority. But I felt as a representative of the bank that I had to inform him of what proceeded prior to that time, and when I did call, he did reconfirm and did state that I did have the full settlement authority.

THE COURT:          What was said at that time about the $2,000 during that conversation?

VICE PRESIDENT:     I explained to him that I had apparently misunderstood the question, and rather than the question being what did we feel the settlement would be worth, that you were asking did I have a limit to what I could settle for. And at that time I stated that I had mentioned $2,000 thinking that that was the calculation that we had discussed.

In addition to calling the witnesses identified above, First American offered into evidence a number of documents recording the occurrence of the pre-conference meeting between the Vice President and the President. Those documents include notes that were taken during that meeting by one of the participants, and a "weekly activity report" that was drafted by the Vice President a few days after the pre-conference meeting. The activity report states, "We met with [the President] to get settlement authority as required by the [court's] order."

C.   THE COURT'S RULING

In its sanctions order, the district court found that "the testimony given by [the Vice President] . . . that he had unlimited settlement authority was false; and, [he] knew that such testimony was false." The court likewise found that "[t]o the extent [the

8

President] suggested in any of his testimony that he gave [the Vice President] unlimited settlement authority, such testimony was false; and, [the President] knew such testimony was false." In addition, the court found that "[a]ll testimony given at any of the hearings that suggested that on March 2 [the Vice President] had authority to offer more than $2,000.00 in settlement was false." The court then concluded,

> [a]ll of the false testimony mentioned above was given either for the purpose of attempting to deceive the court into thinking that First American had complied with the requirements of the . . . order or for the purpose of attempting to deceive the court into thinking that the previously given false testimony was true.

On the basis of these and other, related findings, the court ruled that "First American should be sanctioned by the court pursuant to the inherent power the court has to punish a party for improper conduct." After its motion for reconsideration was denied, First American appealed inter alia the order imposing sanctions and the denial of its motion to reconsider.[2]

## II. ANALYSIS

Federal courts have the inherent power to sanction parties as a means of maintaining obedience to court orders.[3] In evaluating

---

[2]In its notice of appeal, First American also included an appeal from the denial of its motion to amend findings and from the dismissal of the underlying suit. In its appellate brief, however, First American makes no arguments that are particularized to those determinations by the court. Accordingly, any such arguments have been waived.

[3]Natural Gas Pipeline Co. of Am. v. Energy Gathering, Inc., 86 F.3d 464, 467 (5th Cir. 1996).

contempt orders and sanctions imposed under a court's inherent power, we examine whether the district court abused its discretion.[4] It is well established that "[b]ecause of the potency of inherent powers and the limited control of their exercise, . . . they must be used with great restraint and caution."[5]

We hold that the district court did not abuse its discretion in sanctioning First American. The court's decision to impose the sanction was based on its evaluation of the credibility of the witnesses presented by First American to establish that the Vice President had unlimited settlement authority. In countless decisions, we have recognized that the credibility determinations of the district court are entitled to great deference.[6] Thus, even though our reading of the record might lead us to disagree with the conclusions of the district court, under the applicable standard of review, we must affirm.

First American attempts to circumvent the standard of review hurdle by contending that the district court in the instant case

---

[4]See id.

[5]Id. (citing Chambers v. NASCO, Inc., 501 U.S. 32, 111 S. Ct. 2123, 115 L. Ed. 2d 27 (1991)).

[6]See, e.g., Real Asset Management, Inc. v. Lloyds of London, 61 F.3d 1223, 1228 (5th Cir. 1995) ("On appeal, . . . an appellate court gives much deference to the district court's assessment of the credibility of witnesses."); United States v. Alaniz-Alaniz, 38 F.3d 788, 791 (5th Cir. 1994) ("It is not this Court's function to pass on a district court's determination regarding the credibility of the witness."), cert. denied, 115 S. Ct. 1412 (1995); Schlesinger v. Herzog, 2 F.3d 135 (5th Cir. 1993).

10

admitted that it had prejudged the reliability of the witnesses. If the court had in fact stated unequivocally that it would disbelieve future witnesses regardless of their demeanor and the integrity of their testimony, we would agree with First American's position.  In the instant case, however, after expressing some skepticism, the court affirmatively stated that it intended to keep an open mind:  "I'm not saying that I have resolved that you can't put somebody on that I wouldn't accept telling the truth . . . ." Moreover, the court's willingness to continue to review the matter at hand is evidenced by the fact that it held a number of additional hearings after it had announced its "tentative" conclusions. Accordingly, First American's argument fails; and the district court's order imposing sanctions against First American is AFFIRMED.